IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PAUL L. BORREGO, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>Defendant. | **MEMORANDUM DECISION & ORDER**<br><br>Case No: 2:03-CV-281 DN<br><br><br>Magistrate Judge David Nuffer |

Borrego appeals the Commissioner's decision denying his application for disability benefits under Title II of the Social Security Act.[1]  The case was referred to the Magistrate Judge, with the consent of the parties, to conduct all proceedings, pursuant to 28 U.S.C. § 636(c).

**REVIEW OF EVIDENCE**

**A. Hearing Testimony**

A hearing was held before an Administrative Law Judge (ALJ) on January 18, 2002, at which Borrego testified.  In addition, Stanley C. Newhall, M.D., testified as a medical expert (ME), and Dina Galli testified as a vocational expert(VE).

---

[1] 42 U.S.C. §§ 401-434.

**1. Borrego's Testimony**

Borrego was born April 23, 1965, and was thirty-six years old at the time of the hearing.[2] He resided with his sister in her apartment.[3] He had graduated from high school through a special education program.[4] He reported that he got into many fights in school.[5] He had two years of college education through vocational rehabilitation in which he studied general science.[6] His grades were *D*'s, a couple of *B's*, and one or two *C*'s.[7]

Borrego has a history of alcohol and drug abuse. However, he had not used alcohol or illegal drugs for about a year and a half before the hearing.[8]

Borrego described his past jobs, the most recent of which was a butcher-block clerk at Albertson's.[9] He worked at Albertson's from October 1998 to November 2000, except for a nine-month period of incarceration for forgery and DUI. After he was released from prison, he

---

[2]R. at 37.

[3]R. at 36.

[4]R. at 37-38.

[5]R. at 38.

[6]R. at 37, 38-39.

[7]R. at 39.

[8]R. at 39.

[9]R. at 40-46.

returned to his old job at Albertson's.[10]  The alleged onset date of Borrego's disability is

November 2, 2000.[11]

In 1978, at the age of thirteen, Borrego was injured in a motor vehicle accident while

riding in a car driven by his father.[12]  Apparently, just prior to the accident, the police had

handcuffed Borrego's father, and were kicking him and calling him names.  Borrego got a .38

caliber handgun from the car and shot a police officer, as well as shooting apart his father's

handcuffs.[13]  Following the shooting, the car was involved in a high speed-chase and eventually

crashed into some parked cars.[14]  Borrego sustained a head injury in the accident, and was in a

coma for thirty-six days.  He had an operation on his head, but he did not know if he had a metal

plate in his head.  He also shattered his shoulder and right ankle.[15]

In answer to the ALJ's question as to why he could not work, Borrego stated that he had a

hard time concentrating, was constantly nervous, and had a lot of physical problems.  Since an

operation in October 2001, he had not been able to keep food down.[16]  Borrego stated that the

---

[10]R. at 46.

[11]R. at 34, 100.

[12]R. at 47-48.

[13]Tr. at 49-50.

[14]R. at 48.

[15]R. 48-49.

[16]R. at 50.

operation was to repair a hernia in his esophagus, and also to do a second repair of an umbilical hernia.[17]

The most Borrego had weighed in the two years before the hearing was 211 pounds.  At the time of the hearing, he weighed about 178 pounds.[18]  According to Borrego, the weight loss was caused by his inability to keep food down.[19]  He also had problems with constipation and diarrhea.[20]  In addition, he had acid reflux on a constant basis with a lot of pain in his throat and stomach, even though he took pain pills.[21]  Also, Borrego stated that he had hurt his back at hard labor, and had pain in his lower and middle back.[22]

In answer to a question about what gave him enjoyment, Borrego stated that he enjoyed some TV shows.[23]  However, he did not have many friends.  The only people he saw socially were his sister, his nephew, and occasionally his parents and another sister.[24]

---

[17]R. at 52.

[18]R. at 52-53.

[19]R. at 53.

[20]R. at 53-54.

[21]R. at 54-55.

[22]R. at 55.

[23]R. at 55-56.

[24]R. at 56.

At the time of the hearing, he was receiving counseling at Valley Mental Health about once a month.  Before that, he had seen Dr. Heap, a psychiatrist, about once or twice a month for many years.[25]

Borrego stated that he usually went to bed about 10 or 11 p.m, and got up around 10 a.m. During that time, he only slept about four hours because his thoughts kept him awake.[26]  He also saw cat's eyes in the corner of the walls, and heard voices.[27]

He stated that he had constant feelings of guilt and worthlessness, and had thought about suicide.  One night he took seventeen or eighteen Percocets, not wanting to wake up, but he woke up after two or three days.[28]

At times, Borrego felt that Satan was after him.  Borrego stated that he was constantly alert to make sure that "they" do not come to take him away or make him do something.  He also stated that he constantly felt that people were talking about him behind his back.[29]

He testified that he was able to take care of his personal needs such as shaving, washing, and brushing his teeth.[30]  However, he had gone up to three days without doing so.[31]

---

[25]R. at 56-57.

[26]R. at 57.

[27]R. at 58.

[28]R. at 58-59.

[29]R. at 59.

[30]R. at 59.

[31]R. at 60.

The ALJ asked him about getting into physical fights with other people.  He testified that in 1998, his father had given him a beating, but he had not hit his father back.[32]  He had gotten into arguments with bosses and co-workers, but no fistfights.[33]

Borrego stated that he could do his own grocery shopping.[34]  He had a driver's license. However, he did not have a car, so he took the bus for transportation.[35]

In answer to questions from the medical expert, Borrego stated that he helped his sister around the house by taking out the trash, vacuuming, and washing dishes.  He also watched her nine-year-old child while she was at work.[36]  During the day when his sister was gone, Borrego usually stayed around the house.  He watched some TV, and listened to music.  He did not have the patience for reading, and did not play video games.[37]

**2. Testimony of Stanley C. Newhall, M.D.[38]**

Dr. Newhall testified that based on his review of the medical records, Borrego had esophagitis, a mental disorder, substance abuse in remission, and back pain of undetermined

---

[32]R. at 60.

[33]R. at 60-61.

[34]R. at 61-62.

[35]R. at 62.

[36]R. at 63.

[37]R. at 64-65.

[38]Dr. Newhall apparently goes by the name of Clark Newhall.  (R. at 34, 89.)

origin.[39]  The esophagitis, mental disorder, and back pain all appeared to be severe impairments.[40] He stated that the esophagitis did not meet or equal a listing because of the requirement of substantial weight loss.[41]

Turning to the mental impairments, Dr. Newhall opined that Borrego met the "A" criteria for listings 12.02, 12.04, 12.08, and possibly 12.03.[42]  Under the "B" criteria, Dr. Newhall stated that Borrego had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.[43]  Borrego did not have repeated episodes of decompensation of extended duration.[44]  Thus, his mental impairments did not satisfy the "B" criteria.  Dr.  Newhall also opined that the "C" criteria were not satisfied.[45]

Borrego's attorney asked Dr. Newhall about lifting restrictions if Borrego were to have second hernia repair.  Dr. Newhall stated that after surgery Borrego would probably be limited to lifting about five pounds with no stooping or squatting for about two months.[46]  The esophagitis

[39]R. at 65.

[40]R. at 65-66.

[41]R. at 66.

[42]R. at 66.

[43]R. at 67.

[44]R. at 67-68.

[45]R. at 68.

[46]R. 68-69.

would not cause any problems with lifting, except that lifting can cause an increase in the reflux symptoms because of straining.[47]

In response to questioning from the ALJ, Dr. Newhall stated that Borrego's complaints of nausea were consistent with the record, but that his complaints of constipation and diarrhea were not.[48]  Finally, the Dr. Newhall testified that based on the record, Borrego would probably be restricted to simple, one- or two-step kinds of work.[49]

### 3. Testimony of the VE

After classifying each of Borrego's past jobs, the VE testified that if Borrego were restricted to light work, he would not be able to perform any of his past jobs.  Further, he had no skills that would transfer to other light jobs.[50]

She testified, however, that if he were limited to simple, one- or two-step, unskilled jobs, in the light or sedentary category, he could do the jobs of agricultural produce sorter, production assembler, semi-conductor bonder, and food and beverage order clerk which exist in significant numbers in the national economy.[51]  But if he were limited to only minimal contact with the public, the food and beverage order clerk would be precluded.[52]

---

[47]R. at 69.

[48]R. at 69.

[49]R. at 69-70.

[50]R. at 71-72.

[51]R. at 72-73.

[52]R. at 73.

**B. Medical Evidence Related to Borrego's Physical Impairments**

    **1. Work Care**

On March 18, 2000, Borrego strained his back while lifting boxes at his job in the butcher block at Albertson's.[53]  Borrego received treatment at Work Care.[54]  At the initial evaluation on March 23, 2000, he was diagnosed with thoracic and lumbar back strain, and umbilical hernia. He was released for light duty work with no lifting.[55]  On March 30, 2000, Borrego had thoracolumbar tenderness, but had a full range of motion of the lumbar spine, neurological examination of the extremities was unremarkable, motor strength was 5/5, and deep tendon reflexes were 2+ throughout.[56]  A radiological study of the lumbar spine was normal.[57]  On May 17, 2000, at a follow-up appointment, Borrego stated that his back was doing better, but he still had significant pain from the hernia.  He was taking medication (Anaprox) and working in the butcher block thirty-six hours a week which he was tolerating.[58]

    **2. David W. McCray, M.D.**

On November 3, 2000, David W. McCray, M.D., performed surgery to repair Borrego's umbilical hernia.[59]  On December 11, 2000, Borrego reported that he was still having a lot of pain

---

[53]See R. at 169.

[54]See medical records from Work Care, R. at 169-86.

[55]R. at 183.

[56]R. at 181.

[57]R. at 181, 185.

[58]R. at 170.

[59]R. at 187-89.

around the umbilicus.  On examination, the wound was well-healed and the repair felt quite

strong although it was more tender than one would expect a month after surgery.  After

discussing the options, Borrego was given an injection that provided excellent immediate pain

relief.  During the appointment, Borrego asked Dr. McCray about "any permanent disability

associated with this."[60]  Dr. McCray told him that he "had not personally seen any disability after

a hernia repair and that likely over time this pain would resolve."[61]  On December 27, 2000,

Borrego reported "quite a lot of improvement."[62]  On examination, Dr. McCray stated that the

repair "seems to be holding very nicely and feels quite strong."[63]  Dr. McCray told Borrego that

"he need not restrict lifting at all at this point in time."[64]

### 3. University of Utah Emergency Department

On January 4, 2001, Borrego was treated at the University of Utah Hospital Emergency

Department.  Borrego stated that on January 3, he had been given a glass of bleach at a fast-food

restaurant, and he drank about two mouthfuls.[65]  He complained of pain in his stomach and

chest.[66]  Borrego was given a GI cocktail and stated he had good relief from his symptoms.[67]

---

[60]R. at 196.

[61]R. at 196.

[62]R. at 196.

[63]R. at 196.

[64]R. at 196.

[65]R. at 204.

[66]R. at 202.

[67]R. at 202.

### 4. Health & Wellness Clinic, Lynn L. Wilcox, M.D.

Following the bleach ingestion, Borrego was treated at the Health & Wellness Clinic which referred him to Lynn L. Wilcox, M.D., for an endoscopy.[68]  On February 27, 2001, Dr. Wilcox performed an endoscopy which showed erosions in the esophagus which were probably "a continuation of gastroesophageal reflux changes."[69]  She saw no other ulcers or erosions.  Dr. Wilcox took biopsies of the esophagus.[70]  The histology report showed chronic active gastritis, mild esophagitis consistent with reflux, and the presence of "rare bacteria consistent with helicobacter."[71]  Dr. Wilcox placed him on a proton pump inhibitor (PPI), Aciphex.[72]

On March 12, 2001, Borrego was seen at the Health & Wellness Clinic in followup.  He complained of a sore throat, difficulty swallowing, a dry cough, and abdominal pain.[73]  On examination, his throat looked "really, really inflamed."[74]  A test for strep was negative.[75]  He ambulated with a steady gait and climbed easily onto the exam table.[76]  Karen Anderson, FNP, noted that Borrego was applying for Medicaid and other assistance with insurance.  She noted

---

[68]R. at 220.

[69]R. at 211.

[70]R. at 211.

[71]R. at 216.

[72]R. at 211.

[73]R. at 219-20.

[74]R. at 219.

[75]R. at 219.

[76]R. at 219.

that she gave Borrego a note stating that he was unable to work.[77]  The note prepared by Ms. Anderson is dated March 12, 2001, and states:

> To Whom It May Concern:
>     Paul was evaluated in my office 2-9-01 following bleach ingestion.  He has had multiple appointments with specialists and will have a final eval on April 3 10:00 am with Dr. Wilcox.  He has been unable to work during this time.[78]

On July 3, 2001, Dr. Wilcox filled out a form at the request of the agency.  In answer to a question as to when Borrego could return to work, she indicated that there was no date for his return to work until after another endoscopy, scheduled for July 31, 2001.[79]

On July 31, 2001, Dr. Wilcox performed a esophagogastroduodenoscopy and biopsy which revealed "[e]rosions into the midesophagus, ulcers distal esophagus, a patulent gastroesophageal junction."[80]  Dr. Wilcox thought that Borrego was a candidate for surgery.  In the meantime, Borrego was to continue on a double dose of proton pump inhibitors.[81]

### 5. Blair McGirk, M.D.

Blair McGirk, M.D., submitted a report dated May 5, 2001, following a consultative examination at the request of the agency.  Borrego's chief complaints included a "recurrent umbilical hernia with repair, ulcers, back pain, headaches and depression."[82]  Borrego reported

---

[77]R. at 219.

[78]R. at 221.

[79]R. at 268.

[80]R. at 270.

[81]R. at 270.

[82]R. 230.

that the hernia surgery it did not help.  He still had lots of pain around the umbilicus, could feel a

bulge there, and it hurt him when he moved to get up.[83]  He also related the bleach incident and

stated that his stomach was now in constant pain, and he had difficulty swallowing food or

liquids.[84]

Borrego complained of migraine headaches for many years with a visual aura before they

come on.  He gets them three or four times and day, and they last two to three hours.  He usually

takes Tylenol for them.[85]

Borrego complained of depression for at least ten to fifteen years.  He stated that he was

on Prozac, trazodone, and two other psychiatric medication, whose names he could not

remember.  In addition, he had started to hear voices and have visions.  He stated that his

psychiatric symptoms were a major problem for him, and probably his worst.[86]

Borrego complained of pain in his low to mid back, which he described as constant pain

with all movement being painful.  He stated that it was difficult for him to get up out of a chair or

bed.  He stated that the pain was in the center of the back and off to the right side.  It sometimes

went into the right hip, thigh, calf, and into the bottom of the right foot.  He also got muscle

spasms in both legs, mostly in the calves and insteps.  Both legs felt like they go to sleep.[87]

---

[83]R. at 230.

[84]R. at 230.

[85]R. at 230.

[86]R. at 231.

[87]R. at 231.

Borrego reported that he had surgery for a shattered right ankle with plates and screws following the motor vehicle accident when he was thirteen.  He also had damage to the right shoulder, and had a screw in the right shoulder for a while.[88]  Borrego stated that he had brain damage and brain surgery from the auto accident and was in a coma for thirty-five days.  He had vocational rehabilitation to help through school.[89]

Borrego stated that he could walk two to three blocks, but then must stop and rest.  He could stand long enough to wash dishes, but then would be tired and have to sit down.  He was able to sit if he could lean his back against the chair.  He stated that he could not lift, even to carry groceries.[90]

Regarding his daily activities, Borrego reported that he spent most of the day lying down and watching TV.  He did no housework, except for occasionally washing the dishes or making the bed.  However, he liked to write letters.[91]

On examination, Dr. McGirk noted tenderness around the area of the umbilicus, but no hernia.[92]  Range of motion was intact in the neck, back, and extremities, but all movements caused back pain regardless of the type of movement.[93]  Strength was 5/5 bilaterally, but all

_____

[88]R. at 231.

[89]R. at 231.

[90]R. at 231.

[91]R. at 231.

[92]R. at 232.

[93]R. at 232.

attempts at strength in any direction caused back pain.[94]  Dexterity was good bilaterally, and

sensation was intact in all fields.[95]  Borrego could walk, walk heel-toe, toe-heel, and on his toes.

He could walk on his heels, but had back pain.  He could hop with back pain.  He could squat to

70%, and bend to 90°.  His back was tender in the lumbar region.[96]

 Dr. McGirk's impression was

1. Back pain by history and examination.
2. History of ulcers and esophageal inflammation after drinking bleach given
  to him accidently.
3. Psychiatric problems.[97]

## C. Medical Evidence Related to Borrego's Mental Impairments

### 1. John D. Hardy, Ph.D.

 In August and September 1996, John D. Hardy, Ph.D., conducted a psychological/

neuropsychological evaluation of Borrego at the Tooele County Jail.[98]  Borrego's intellectual

functioning was in the "borderline to low average range."[99]  Dr. Hardy stated that it was difficult

to tell how much Borrego's head injury affected his ability to learn because, despite his deficits,

Borrego's scores were "not reflective of an individual who has slight specific brain injury."[100]

---

[94]R. at 232.

[95]R. at 233.

[96]R. at 233.

[97]R. at 233.

[98]Psychological Evaluation, R. at 159-64.

[99]R. 163.

[100]R. at 163.

Rather, his performance was "more consistent with an individual who has general learning difficulties and lack of attending to school type situations where information is offered."[101]  Other neuropsychological testing was within normal limits, except the Digital Finger Tapping Test which showed a relatively low score on the left (non-dominant) hand "suggesting a right hemisphere motor strip impairment."[102]  Dr. Hardy stated:

> Most salient is his extremely poor judgment which has resulted in very limited understanding of the rules by which society functions and common sense judgment.  He is very concrete in his understanding of things and this likely results in his having a very difficult time navigating the complexities of usual society.[103]

Borrego also appeared to be "quite aggressive with little or no provocation."[104]

In summary, Borrego appeared to have some general neuropsychological deficits which did not appear to be "site specific," and "may be more along the lines of 'organic brain syndrome' where these individuals simply are unable to learn to the average range of society and continually have difficulties meshing with society and being particularly effective."[105] Borrego also had significant drug and alcohol problems, which combined with his general personality and quick anger could have disastrous results.[106]

---

[101]R. at 163.

[102]R. at 163.

[103]R. at 163.

[104]R. at 163.

[105]R. at 163-64.

[106]R. at 164.

Dr. Hardy stated that Borrego presented a very difficult treatment case where medications were not likely to have a significant impact.  He noted that Borrego had three treatment failures for drug and alcohol problems and appeared to have little motivation for another attempt.  Dr. Hardy concluded that because of Borrego's short temper and limited motivation, there were no treatment programs that would be good choices.[107]  Dr. Hardy thought the best treatment might be medication for the explosiveness of Borrego's anger.[108]

**2. Louis F. Morse, Ph.D**

Louis F. Morse, Ph.D., performed a psychological evaluation on May 14, 2001 at the request of the agency.[109]  Dr. Morse's psycho-diagnostic impression was

| | |
|---|---|
| Axis I | 296.33 Major Depression |
| | History of Alcoholism and Substance Abuse |
| Axis II | Antisocial Personality Features |
| Axis III | Shoulder, Back and Leg Pain and Numbness, Ulcers, Headache |
| Axis IV | Unemployment, Inadequate Finances, Legal System Involvement |
| Axis V | GAF 55, Current[110] |

Borrego summarized his health history relating the 1978 car wreck in which he sustained a head injury, and injuries to his right shoulder and right ankle.  He also told Dr. Morse that in March 2001, he got a hernia and injured his back while lifting heavy boxes.[111]  He stated that his back, right shoulder, and right leg hurt and go numb, and that he had to use a cane when he went

---

[107]R. at 164.

[108]R. at 164.

[109]R. at 234-37.

[110]R. at 234.

[111]R. at 234.

for walks.[112]  He also stated that he had seizures since he was a little boy, and that he had a

seizure the other day.[113]  He also related the bleach-ingestion incident.  He stated that after he

drank the bleach, he was diagnosed with ulcers and was still taking medication for this.[114]

Borrego further stated that he had been diagnosed by Dr. Heap with depression, and that he was

taking trazadone, Prozac, and Celexa.  He also had alcohol and substance abuse problems, but

had stopped drinking and using drugs about a year and a half earlier.[115]

Borrego lived with his girlfriend in a basement apartment in her parents' house.  He

sometimes cooked and washed dishes.  His girlfriend did the shopping and laundry.  Borrego

liked to stay by himself.  His activities included lying on a heating pad, and watching TV, and

riding his bike.  He talked on the phone to his nephew and sister.  He walked about half a block,

and went to the mall.[116]

During the interview, Borrego was alert, verbal, friendly, and courteous.  He smiled and

made eye contact without difficulty.[117]  He sat on the couch without complaining of back pain.

However, he struggled in getting off the couch at the end of the interview.  Otherwise, his motor

behavior was normal without restlessness, agitation, tremors, or tics.  Borrego stated that he did

not have a balance problem, but that he fell every week because his right leg was weak.  If he sat

---

[112]R. at 234-35.

[113]This appears to be the first reference to seizures in the record.

[114]R. at 235.

[115]R. at 235.

[116]R. at 235.

[117]R. at 235-36.

for a long time, he got back pain, and it was hard to get up from a chair.  He did not like to stand

because it hurt.  After he walked about a block, he got tired.  He could not lift, but he could take

care of personal hygiene.  He stated that he had trouble reading a phone book.[118]

Borrego was oriented to person, time, and place.  He stated that he fainted sometimes, the

last time about eight months ago, and he got headaches.[119]

Dr. Morse did not observe any significant memory lapses.  Borrego was able to answer

correctly several general information questions.  His speech was clear, and he had adequate

expressive and receptive language skills.  Dr. Morse estimated Borrego's general intellectual

functioning to be in the "mild/borderline retarded range."[120]

Borrego's mood and affect were appropriately even and stable.[121]  His thought process

was logical and coherent, and he showed no signs of a thought disorder.  However, he reported

that he hears voices and gets hallucinations.[122]  Dr. Morse noted that Borrego "has a history of

treatment for depression.  He is currently being medically treated for this mood disturbance.  The

absence of signs of a significant mood disorder in the office today is presumed to result from

---

[118]R. at 236.

[119]R. at 236.

[120]R. at 236.

[121]R. at 236.

[122]R. at 237.

effective medical treatment."[123]  Dr. Morse concluded that Borrego "demonstrated adequate social

skills," and was "able to understand, remember and follow simple instructions."[124]

### 3. Alan F. Heap, M.D.

Dr. Heap, a psychiatrist, treated Borrego for over ten years.[125]  On a prescription form

dated January 8, 2001, Dr. Heap wrote, "This man bears the diagnosis of mild mental retardation

DSM IV Axis I 317.  He can function on a 6th grade mental level or @ 90% impaired on an adult

level."[126]

In a report prepared at the request of Disability Determination Services (DDS) dated

April 19, 2001, Dr. Heap noted that Borrego has a long history of episodic employment.[127]

Borrego claimed to have been hearing voices several times a day since 1997.[128]  These voices

interrupt his ability to concentrate impairing his ability to perform gainful employment.[129]

Borrego was oriented to person, place, and time, but had symptoms of depression including

unemployment, sleep disturbance, tearfulness, and hopelessness.[130]  Borrego could drive a car and

take care of personal hygiene, and "seems to relate ok" to others such as family members,

---

[123]R. at 237.

[124]R. at 237.

[125]R. at 257.

[126]R. at 258.

[127]R. at 226.

[128]R. at 226, 228.

[129]R. at 228.

[130]R. at 227.

friends, an co-workers.[131]  Dr. Heap noted that Borrego has "low employment skills, bad back, hearing voices, quite manipulative."[132]  Dr. Heap stated that Borrego's condition was not likely to improve.  Dr. Heap's diagnosis was atypical psychosis with major depression.[133]

In a report dated June 28, 2001, Dr. Heap stated that "Mr. Borrego recently insisted that I write another letter on his behalf as he claims he cannot work."[134]  Dr. Heap reported that Borrego claimed to have heard "voices from the dead," and "sometimes I feel that Satan is after me."[135]  Borrego also reported "symptoms of depression, such as anhedonia, lethargy, insomnia, and helplessness."[136]  Dr. Heap had treated Borrego with antidepressants and anti-psychotic medications.  Borrego stated that the medications help, but not enough.  Dr. Heap gave Borrego the following diagnoses:

    Axis I:      Major Depression (296.34), severe, with psychotic features
    Axis II:     Mild Mental Retardation (317)
    Axis III:    Back pain, esophagitis, ulcers
    Axis IV.     Occupational, Educatinal [sic], and Economic Problems
    Axis V:      Global Assessment of functioning (GAF), presently 55, past year,
                 55.[137]

---

[131]R. at 228.

[132]R. at 229.

[133]R. at 229.

[134]R. at 257.

[135]R. at 257.

[136]R. at 257.

[137]R. at 257.

**D. Administrative Decision**

At the administrative level, the ALJ found that Borrego suffers from several severe impairments including "personality disorder and borderline intellectual functioning (rule out organic brain damage), depression, schizophrenia, esophagitis, and back pain of unspecified origin".[138]  After conducting the familiar five-step analysis,[139] the ALJ concluded at step five that Borrego was capable of performing  jobs that exist in significant numbers in the national economy, and was therefore not disabled.[140]  The Appeals Council declined to review the decision.[141]

## DISCUSSION

In this court, Borrego has raised five issues:  (1) The ALJ's step-three determination was legally insufficient; (2) the ALJ failed to give proper weight to the opinions of Borrego's treating and examining physicians; (3) the evidence supports a finding that a listing is met; (4) the ALJ's determination of Borrego's RFC was legally inadequate; and (5) the ALJ did not properly evaluate the pain evidence.

It should be noted that only one of these arguments, failure to give proper weight to the opinion of the treating physician, was raised in Borrego's opening brief.  This is true despite the

---

[138]R. at 14, 18.

[139]See *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[140]R. at 18, 19.

[141]R. at 5.

fact that Borrego obtained no fewer than eight extensions of time spanning a full year in which to file this brief.[142]  The other issues are raised for the first time in Borrego's Reply Brief.[143]

Raising an issue for the first time in a reply brief deprives the defendant of the opportunity to address the issue in its opposing brief, and results in the issues not being well-framed for the court.  Generally, arguments first raised in a reply brief are waived.[144] Nevertheless, in the interest of fairness, and because the Commissioner has not objected to Borrego's raising new issues in his reply brief, the court will address each issue.

## A. Standard of Review

The court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied.[145] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[146]

## B. Step-Three Determination

The first and third issues raised by Borrego relate to the ALJ's determination at step three that Borrego's impairments did not meet or equal a listed impairment.  Borrego contends that (1)

---

[142]See orders granting Borrego's motions for enlargement of time, docket no. 12, filed October 29, 2003; docket no. 14, filed January 15, 2004; docket no. 16, filed February 5, 2004; docket no. 18, filed March 9, 2004; docket no. 20, filed March 29, 2004; docket no. 21, filed June 2, 2004; docket no. 24, filed July 26, 2004; docket no. 26, filed September 24, 2004.

[143]Docket no. 41, filed July 1, 2005.  Borrego also delayed filing his reply brief (due December 6, 2004) for almost seven months by obtaining additional extensions.

[144]See *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005); *United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996).

[145]*Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

[146]*Hamlin*, 365 F.3d at 1214 (quoting *Doyal*, 331 F.3d at 760).

the ALJ's step-three determination was legally insufficient; and (2) the evidence supports a finding that a listing is met.  Because these two issues are related, the court considers them together.

### 1. Legal Sufficiency of the Step-Three Determination

Under the Social Security Act, the ALJ is required to discuss the evidence and explain why he finds at step three that the claimant did not meet or equal a listed impairment.[147]  In *Clifton v. Chater*, the ALJ failed to discuss the evidence or state his reasons for concluding that the claimant was not disabled at step three or even identify the relevant listing.  Rather, he simply made a summary conclusion that the claimant's impairments did not meet or equal any listed impairment.  The Tenth Circuit remanded because "[s]uch a bare conclusion is beyond meaningful judicial review."[148]

In this case, the ALJ stated that he had considered Borrego's physical impairments under the listings for musculoskeletal and digestive impairments, and found that none of the requisite criteria were met.[149]  In addition, the ALJ stated that Borrego's mental impairments,

> when evaluated generally under Section 12.00, cause no more than mild limitations on activities of daily living and no greater than moderate limitations on social functioning and maintaining concentration, persistence and pace. Moreover, there is no evidence of repeated episodes of decompensation, each of extended duration, a residual disease process that would cause the claimant to decompenstate, or an inability to function independently.[150]

---

[147]*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see* 42 U.S.C. §§ 405(b)(1).

[148]*Id.* at 1009.

[149]R. at 14.

[150]R. at 14.

Relying on *Clifton*, Borrego asserts that the ALJ's reference to general categories of listings for musculoskeletal, gastrointestinal, and mental disorders was improper; rather the ALJ was required to explain why Borrego's impairments did not meet a *specifically identified* listing. The court concludes that the ALJ's findings at step three were adequate.  He identified the general categories he considered in determining that Borrego's impairments did not meet the listings.  Regarding Borrego's physical impairments, there is no evidence in the record to suggest that he meets the requirements for any listing in the musculoskeletal category.  With respect to his digestive impairment, the ME testified at the hearing that Borrego's esophagitis did not meet or equal a listing in the digestive system category because it was not accompanied by a substantial weight loss as required by the listing.[151]

Further, under the facts of this case, it was appropriate for the ALJ to consider Borrego's mental impairments generally under section 12, because the medical evidence and the testimony of the ME supports a finding that Borrego's impairments met the "A" criteria for several different mental impairments.  Thus, the determination turned on whether the "B" or "C" criteria were satisfied.  Since the "B" criteria are the same for all of the mental impairments identified by the ME, it was unnecessary for the ALJ to analyze each impairment separately under the "B" criteria.  If the "B" criteria are not met, some impairments can still satisfy the listings if they satisfy the "C" criteria.  However, as with the "B" criteria,  the "C" criteria are the same for each impairment to which they apply.  Since Dr. Newhall testified that Borrego's mental impairments

---

[151]R. at 66.

did not satisfy either the "B" or the "C" criteria, there was no need for the ALJ to make a separate analysis of each impairment.

## 2. The Combination of Borrego's Impairments Do Not Meet or Equal a Listed Impairment

Borrego appears to argue that the combined effect of his impairments meets or equals a listing.[152]  The claimant has the burden of establishing that his impairment or combination of impairments is equivalent to a listed impairment.[153]

The Listing of Impairments[154] (the "listings") describes various physical and mental abnormalities and illnesses categorized by the body system they affect.[155]  The purpose of the listings is to provide a description of impairments that are considered so severe as to give rise to a conclusive presumption of disability, thereby streamlining the disability determination process.[156]

To match a listing, an impairment must meet *all* of the specified medical criteria for that listing.  If the impairment is comprised of only some of the criteria, no matter how severe, it will not qualify.[157]

---

[152]Reply Brief at 3.

[153]*See Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir.1993); *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).

[154]The Listing of Impairments is found at 20 C.F.R. pt. 404, subpt. P, app. 1 (pt. A).

[155]*Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990); *Davidson v. Sec'y of HHS*, 912 F.2d 1246, 1252 (10th Cir. 1990).

[156]*Zebley*, 493 U.S. at 532; *Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *see Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *Davidson*, 912 F.2d at 1252.

[157]*Zebley*, 493 U.S. at 530; *accord Davidson*, 912 F.2d at 1252.

Because the listings could not possibly include every impairment severe enough to prevent the claimant from engaging in any gainful activity, the regulations provide guidance for determining whether an unlisted impairment or combination of impairments is medically equivalent to a listed impairment.[158]  In order to establish that a combination of impairments is "equivalent" to a listed impairment, a claimant must present medical findings equal in severity to *all* of the criteria of the one listed impairment most similar to the claimant's most severe impairment.[159]  The question whether a claimant meets or equals a listed impairment must be based on medical evidence alone.[160]  Thus, a claimant cannot qualify under the "equivalence" test by showing that the "overall functional impact" of his impairments is as severe as that of a listed impairment.[161]

In this case, Borrego has not explained how his combination of impairments could be considered medically equal to a listed impairment.[162]  Rather, he seems to argue that the combined *effect* of his impairments is the functional equivalent of a listed impairment.[163]  As discussed above, a claimant cannot meet the "equivalence" test by showing that the overall

---

[158]*Davidson*, 912 F.2d at 1251-52; see 20 C.F.R. § 404.1526.

[159]20 C.F.R. § 404.1526(a); *Zebley*, 493 U.S. at 531; *accord Davidson*, 912 F.2d at 1252.

[160]20 C.F.R. §§  404.1526(b), 404.1529(d)(3); *see Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).

[161]*Zebley*, 493 U.S. at 531; *accord Davidson*, 912 F.2d at 1252.

[162]*See Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001)(noting that the claimant "has offered no theory, plausible or otherwise, as to how his [impairments] combined to equal a listed  impairment.").

[163]Reply Brief at 3.

functional impact of his combined impairments is as severe as that of a listed impairment.[164]

Accordingly, this argument is without merit.

### 3. Borrego's Mental Impairment Does Not Satisfy the Listings

Borrego contends that he meets the criteria for listing 12.02 *Organic Mental Disorders*. In order to satisfy this listing, Borrego's mental impairment would have to satisfy both the "A" and "B" criteria, or the "C" criteria for the listing.  At the hearing, the ME testified that Borrego might meet the "A" criteria for organic mental disorder due to a head injury.[165]  To satisfy the B criteria, the impairment must result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.[166]

Concerning his activities of daily living, Borrego testified that he is able to take care of his personal hygiene needs,[167] can do his own grocery shopping,[168] and takes the bus for transportation.[169]  In addition, he helps his sister around the house by taking out the trash, vacuuming, washing dishes, and baby-sitting her nine-year-old child while she is at work.[170]  He

---

[164] *Zebley*, 493 U.S. at 531.

[165] R. at 65, 66.

[166] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 B.

[167] R. at 59.

[168] R. at 61-62.

[169] R. at 62.

[170] R. at  63.

also watches some TV, and listens to music.[171]  Regarding social functioning, Borrego testified that he does not have many friends, but he sees his sisters, nephew, and parents about once a month.[172]

The ME testified that based on Borrego's testimony, he did not meet the "marked" level for any of the "B" criteria.[173]  He stated that Borrego had "mild" restrictions in his activities of daily living.  The ME stated that even though Borrego had a "fairly wide network of family social events," he rated Borrego as having "moderate" difficulties in maintaining social functioning because of difficulties he had with others outside the family.[174]  In addition, the ME testified that Borrego had "moderate" difficulties in maintaining concentration, persistence, or pace.  He stated that Borrego's TV watching "doesn't square with a real difficulty in persistence."[175]  Although Borrego might have some problems with pace when working at tasks, the ME thought those were only moderate limitations.[176]  Finally, the ME testified that Borrego did not have repeated episodes of decompensation of extended duration.  Although Borrego did have rage episodes, they were not of extended duration, and do not seem to be "decompensation" as that term is defined.[177]

---

[171]R. at 55-56, 64-65.

[172]R. at 56.

[173]R. at 67.

[174]R. at 67.

[175]R. at 67.

[176]R. at 67.

[177]R. at 67.

Similarly, Borrego's mental impairments did not satisfy the "C" criteria which are defined as follows:

> C.  Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support, and one of the following:
>
> > 1.  Repeated episodes of decompensation, each of extended duration; or
> >
> > 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> >
> > 3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.[178]

In concluding that Borrego's impairment did not meet the "C" criteria, the ME opined that the evidence of marginal adjustment was not there.  Given Borrego's long history of working in various capacities, he seemed to be able to adjust at times, and had adjusted within his family. Finally, according to the ME, living with one's sister does not count as a highly supportive living arrangement.[179]  Accordingly, the court concludes that the opinion of the ME, together with the evidence on which it is based, constitutes substantial evidence supporting the ALJ's determination that Borrego's mental impairment did not satisfy the listing for organic mental disorders.

---

[178]20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02 C.

[179]R. at 68.

**C. Weight Given the Opinion of Treating and Examining Physicians**

The ALJ must evaluate all medical opinions in the record.  However, the weight given each opinion will vary according to the relationship between the claimant and the medical professional.[180]  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."[181]

The ALJ is required to give controlling weight to the opinion of the treating physician so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record.[182]  "An ALJ may disregard a treating physician's opinion, however, if it is not so supported."[183]  In all cases, the regulations require that the ALJ "give good reasons" in his decision for the weight that he gave to the treating physician's opinion.[184]

In his opening brief, Borrego argues that the ALJ erred in rejecting the opinion of his treating physician, Dr. Wilcox, that he was unable to work.  On April 3, 2001, Dr. Wilcox wrote in a Chart Note that Borrego came in with digestive complaints.  He claimed he had difficulty swallowing, pain in his throat when he swallowed, and reflux on a regular basis.  She wrote, "He is unable to work at the present time because of the difficulty with his epigastric pain, difficulty

---

[180]*Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

[181]*Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004); 20 C.F.R. § 404.1527(d)(1).

[182]*Hamlin*, 365 F.3d at 1215. (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).

[183]*Doyal*, 331 F.3d at 762; *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994).

[184]*Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215.

swallowing."[185]  On June 18, 2001, Dr. Wilcox entered a Chart Note in which she stated Borrego

"states that the heartburn and discomfort in his chest are most disconcerting and a real problem at

present.  He feels that he is unable to work and that it is a disabling symptom at present and is

consuming his day."[186]  On the same day, she  wrote a brief statement addressed "To Whom It

May Concern" in which she stated:  "Paul has refractory reflux and is unable to work at

present."[187]

The ALJ acknowledged Dr. Wilcox's statement that Borrego was unable to work,

observing that Dr. Wilcox attributed this assessment to epigastric pain and difficulty

swallowing.[188]  The ALJ noted, however, that Dr. Wilcox did not offer any specific functional

limitations.  Further, her progress notes showed conflicting reports with difficulty swallowing.[189]

The ALJ also observed that Borrego had not followed the prescribed treatment for his

esophagitis.  For example, on April 3, 2001, Dr. Wilcox noted that Borrego came in with

digestive complaints.  He stated that medication had helped, but it had run out two days ago and

he had not taken any for two days.[190]  Further, a chart note dated May 4, 2001, indicates that

Borrego failed to pick up his medication from the doctor's office on March 5, 2001.[191]  The ALJ

---

[185]R. at 251.

[186]R. at 249.

[187]R. at 248.

[188]ALJ's Decision, R. at 16, referring to Dr. Wilcox's notes, R. at 248-49.

[189]According to Dr. Wilcox's notes, Borrego complained of difficulty swallowing on April 3, 2001.  (R. at 251.)
However, he denied dysphagia (difficulty swallowing) on June 18, 2001.  (R. at 249.)

[190]R. at 251.

[191]R. at 251.

stated that he gave less weight to the cursory opinion of Dr. Wilcox because it was unreasoned and internally inconsistent.[192]

The court concludes that the ALJ gave "good reasons"[193] for rejecting Dr. Wilcox's opinion.  Dr. Wilcox provided no functional limitations that would interfere with Borrego's ability to perform work activities.  Further, the ALJ's conclusion that Borrego's esophagitis would not preclude all work is supported by the opinion of the ME who testified that the esophagitis would not pose any problems "with lifting or anything," except that the strain might increase the reflux symptoms during lifting.[194]

In his Reply Brief, Borrego seems to assert that the ALJ did not give appropriate weight to the opinions of his treating and examining mental health providers, but instead relied upon the opinion of Dr. Newhall, the Medical Expert, who testified at the hearing.[195]  Borrego asserts that the ME's experience was in the field of emergency medicine, and he had no particular expertise in the field of mental health.[196]

Although Borrego's mental health providers found that he had mental impairments, none of the them indicated that his impairments rendered him unable to work.  For example, Dr. Morse, an examining source, stated that Borrego's mood disorder seemed to be controlled by "effective medical treatment."  He further noted that Borrego "demonstrated adequate social

---

[192]R. at 16.

[193]*Doyal*, 331 F.3d at 762.

[194]R. at 69.

[195]Plaintiff's Reply Brief at 5, docket no. 41, filed July 1, 2005.

[196]See Dr. Newhall's curriculum vitae, R. at 89.

skills," and was "able to understand, remember and follow simple instructions."[197]   Although Dr.

Heap did write a note at Borrego's insistence in which he stated Borrego "claims he cannot

work,"[198] this letter cannot be construed as an opinion by Dr. Heap that Borrego's mental

impairments were so severe as to preclude the ability to work.

## D. Sufficiency of ALJ's RFC Determination

Borrego asserts that the ALJ's RFC determination was legally inadequate, apparently

because it lacked sufficient detail and specificity.   In particular, he argues that the ALJ did not

address his limitations in manual dexterity and coordination as reflected on the Digital Finger

Tapping Test;   limitations associated with his antisocial personality disorder, such as stealing,

manipulating others, lying, and getting into trouble with authorities; and limitations resulting

from his back, ankle and shoulder impairments.[199]

Dr. Hardy administered the Digital Finger Tapping Test, along with several other tests, in

an effort to determine the effect of Borrego's brain injury on his judgment.   In discussing the

finger tapping test, Dr. Hardy stated that it "deals with simple motor speed."[200]   Borrego's

performance with his dominant (right) hand reflected "at most, mild impairment."[201]   His

performance with his non-dominant hand suggested mild to moderate impairment.  Dr. Hardy

---

[197]R. at 237.

[198]R. at 257.

[199]Plaintiff's Rely Brief at 8, docket no. 41, filed July 1, 2005.

[200]R. at 163.

[201]*Id.*

stated that this suggested that Borrego might have some cortical damage in the right hemisphere, "although at most, mild to moderate proportions."[202]

The court concludes that Borrego's interpretation of these test results is insufficient to undermine the ALJ's decision that he was capable of performing jobs existing in the national economy. Because the purpose of the finger-tapping test was to assess brain impairment, it is far from clear what the test results mean in terms of a possible limitation in use of the hands. Neither Dr. Hardy nor any of the reviewing physicians suggested that Borrego had hand limitations based on this test result that would limit his ability to work. Moreover, there is no evidence in the record of hand difficulties, and Borrego has not alleged any hand difficulties prior to filing his reply brief.

Borrego also states that the ALJ failed to consider the limitations resulting from his back, ankle, and shoulder impairments. In support of this argument, Borrego cites specific medical evidence that was submitted to the Appeals Council after the ALJ issued his decision. The additional evidence relied on by Borrego consists of reports by a physical therapist who treated him for right shoulder, neck, ankle, and back pain,[203] and a radiological study of his right shoulder.[204]

---

[202]*Id.*

[203]R. at 296-99.

[204]R. at 343.

Under the regulations, the Appeals Council must consider additional evidence submitted on appeal if it is new, relevant, and relates to the date on or before the ALJ's decision.[205]  If the evidence does not meet these qualifications, it plays no further role in the court's review of the Commissioner's decision.[206]  If the evidence does qualify, and the Appeals Council considers it, it becomes part of the record for the court to review.[207]  In this case, the evidence submitted to the Appeals Council appears not to meet the criteria because it relates to a time period after the ALJ's decision which was issued on February 8, 2002.  The physical therapy reports are dated July and August 2002, several months after the ALJ's decision.[208]  Similarly, the radiological study was conducted on November 29, 2002.[209]

The Appeals Council did not state whether the new evidence met the criteria.  However, it did state that it had considered the additional evidence, and "concluded that this evidence does not provide a basis for changing the Administrative Law Judge's decision."[210]  The Council further stated that the new evidence was being made a part of the record.[211]  Because the Appeals Council considered the additional evidence submitted by Boreggo, it becomes part of the record

---

[205]20 C.F.R. § 404.970(b); *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004); *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).

[206]*Chambers*, 389 F.3d at 1142.

[207]*Chambers*, 389 F.3d at 1142.

[208]R. at 296, 298.

[209]R. at 343.

[210]R. at 5.

[211]R. at 7.

to be considered by the court in evaluating whether the ALJ's decision is supported by substantial evidence.[212]

The court agrees with the Appeals Council that the new evidence does not provide a basis for changing the ALJ's decision.  On August 20, 2002, Borrego told the physical therapist that his right ankle gave way at times while walking.  In addition, he had pain in the ankle with walking which Borrego rated as an eight on a scale of ten.  On examination, Borrego demonstrated an altered gait, but the range of motion in his right ankle was within normal limits.[213]  The physical therapist noted tenderness along the lateral aspect of the right fibula and ankle.  There was also decreased strength in the right ankle with "4/5 plantar flexion, 4/5 dorsiflexion, 3+/5 eversion, and inversion is 4/5."[214]

Borrego seems to suggest that the ankle problem might interfere with some of the jobs that the ALJ found that he could perform.  However, the report makes no reference to the effect the ankle problem might have on Borrego's ability to work.  The examination showed normal range of motion within the ankle with mild weakness.  Although Borrego complained of pain on walking and had an altered gait, the physical therapist clearly anticipated that these problems would be alleviated with treatment.  The report lists as short-term goals:  decreasing ankle pain to 0-2/10 at all times, improving gait, and increasing ankle strength to 4-4+/5 in all planes of movement.[215]  Thus, even if the ankle injury might have interfered with Borrego's ability to work

---

[212]*Chambers*, 389 F.3d at 1142-43; *Threet*, 353 F.3d at 1191; *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).

[213]R. at 296.

[214]R. at 297.

[215]R. at 297.

in the short term, the report does not support a conclusion that it could be expected to last for a period of twelve months as required by the Social Security Act.[216]  Similarly, the radiology report which showed some degeneration in the shoulder joint,[217] without more, is insufficient to undermine the decision of the ALJ.

Borrego also states that the ALJ failed to properly consider the limitations associated with his antisocial personality disorder, "such as stealing, manipulating others, lying, getting into trouble with the authorities."[218]  It is clear, however, that the ALJ considered the evidence related to Borrego's mental impairments.  Further, the testimony of the ME supports the ALJ's RFC findings.  Accordingly, the court concludes that the ALJ's assessment of Borrego's mental RFC is supported by substantial evidence in the record.

**E.  Sufficiency of the ALJ's Pain Determination**

Borrego states that the medical evidence shows that he suffered from degenerative changes in his ankle, back, and shoulder.  Yet the ALJ determined that these impairments were not severe, and gave them no further consideration.  It should be noted that this statement is erroneous in that the ALJ found that Borrego's back pain *was* a severe impairment.  Borrego asserts that the ALJ failed to apply the analysis set forth in *Luna v. Bowen*.[219]

In *Luna*, the Tenth Circuit set forth a framework for evaluating subjective allegations of pain.  Under this analysis, "if an impairment is reasonably expected to produce *some* pain,

---

[216] 42 U.S.C. § 423(d)(1)(A)

[217] R. at 343.

[218] Plaintiff's Reply Brief at 8, docket no. 41, filed July 1, 2005.

[219] 834 F.2d 161 (10th Cir. 1987).

allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence."[220]  Factors to be considered include

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.[221]

As the Tenth Circuit has observed, the evaluation of a claimant's subjective allegations of pain and other symptoms "ultimately and necessarily turns on credibility."[222]  Generally, credibility determinations are the province of the ALJ and should not be disturbed if supported by substantial evidence.[223]  Nevertheless, the ALJ's findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[224]  In *Kepler v. Chater*, the Tenth Circuit held that the ALJ must give specific reasons for rejecting a claimant's subjective allegations of pain.[225]  However, so long as the ALJ sets forth the specific evidence he relies on in assessing credibility, the requirements of *Kepler* are satisfied.[226]

---

[220]*Luna*, 834 F.2d at 164; *accord Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993); *Huston v. Bowen*, 838 F.2d 1125, 1129 (10th Cir. 1988).

[221]*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(quoting *Thompson*, 987 F.2d at 1489); *accord Huston*, 838 F.2d at 1132.

[222]*White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).

[223]*McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002); *White*, 287 F.3d at 909; *Kepler*, 68 F.3d at 391.

[224]*McGoffin*, 288 F.3d at 1254 (quoting *Huston*, 838 F.2d at 1133).

[225]*Kepler*, 68 F.3d at 391.

[226]*White*, 287 F.3d at 909.

The court concludes that the ALJ adequately considered Borrego's allegations of pain and other subjective symptoms.  While the ALJ did not specifically mention the *Luna* case, he stated that he had considered all of the evidence, and specifically mentioned the factors to be considered in evaluating a claimant's allegations of disabling pain.  He stated, however, that he found  Borrego's allegations not credible.[227]  Further, "the ALJ carefully set forth the reasons supporting his negative credibility assessment."[228]

In support of his credibility determination, the ALJ stated that Borrego's testimony, when viewed in conjunction with the medical record, was not supported to the extent alleged, and demonstrated numerous inconsistencies.[229]  The ALJ noted that Borrego described daily activities that were not limited to the extent one would expect, given his complaints of disabling symptoms and limitations.[230]  For example, Borrego assisted with household chores and baby-sat his nephew, could drive a car, and take care of personal hygiene.  A review of Borrego's work history showed that he had worked only sporadically prior to the alleged onset of his disability which raised a question in the ALJ's mind as to whether his continued unemployment was actually due to his medical impairments.  The ALJ also noted that Borrego had an extensive history of legal problems, beginning at age thirteen when he shot a police officer.  He also had arrests for forgery and DUI.[231]

---

[227]R. at 15.

[228]*White*, 287 F.3d at 909.

[229]R. at 15.

[230]R. at 15-16.

[231]R. at 16.

The ALJ also observed that Borrego was successfully treated for an umbilical hernia and released for work with no restrictions in December 2000.[232]  The ALJ thought it interesting that Borrego inquired about "permanent disability" for this condition.[233]  The ALJ also noted that while Borrego allegedly sustained the hernia in connection with the work-related accident on March 18, 2000, the evidence indicates that the abdominal symptoms actually began prior to that date.[234]  In fact, Borrego's worker's compensation claim with respect to the hernia was denied as not work-related.[235]

The ALJ noted that Borrego alleged that the accident caused lower back problems. However, X-rays of the lumbar spine taken at the time were normal, and Borrego was diagnosed with thoracic and lumbar strain.[236]  Subsequent medical records showed improvement with normal findings on examination.[237]  The ALJ further observed that one physician stated that Borrego was "clearly manipulating for pain pills and other drugs."[238]

---

[232]R. at 16; see Dr. McCray's note dated December 27, 2000, R. at 196.

[233]R. at 16; see Dr. McCray's note dated November 13, 2000, R. at 196.

[234]R. at 16; see Work Care note, dated March 23, 2000, at 183, stating Borrego reported that "he has a lump in the middle of the abdomen which has been present for several weeks."

[235]R. at 16; see Work Care notes, R. at 170.

[236]R. at 16; see X-ray report at 185; Work Care notes at 181, 183.

[237]R. at 16; see Work Care notes at 170, 172.

[238]R. at 16.  The ALJ apparently was mistaken in attributing this statement to a physician treating Borrego for back pain.  It actually was made by Dr. Heap, Borrego's psychiatrist, on March 21, 2000, a few days after the alleged back injury.  See Dr. Heap's note, R. at 191.

The ALJ also observed that an examining psychologist stated that Borrego had little motivation for treatment.[239]  In addition, Borrego had not followed prescribed treatment for his physical conditions.  For example, Dr. Wilcox noted that Borrego's esophagitis was refractory to medical treatment, yet he had not been taking the proper dosage of his medication.[240]  Dr. Wilcox's records also showed that Borrego failed to pick up prescribed medication in March 2001.[241]  Finally, the ALJ noted that Borrego did not even mention his ankle, shoulder and forehead complaints until the close of the hearing.[242]  Accordingly, the court concludes that the ALJ adequately stated the reasons for his credibility determination, and it is supported by substantial evidence.

## ORDER

The court concludes that the ALJ applied the correct legal standards and his decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is AFFIRMED.


March 29, 2006.

BY THE COURT:


David Nuffer
U.S. Magistrate Judge

---

[239]R. at 16; see Dr. Hardy's report at 164.

[240]R. at 16; see Dr. Wilcox's note at 249.

[241]R. at 16; see Dr. Wilcox's notes at 251.

[242]R. at 15.